UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE APPLICATION OF
TATIANA AKHMEDOVA,

    Applicant,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782

CASE No.

_____/

**DECLARATION OF ALESSANDRO TRICOLI IN SUPPORT OF
*EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

I, **ALESSANDRO TRICOLI**, declare under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1. I am a partner in a firm of legal consultants practicing United Arab Emirates (UAE) law. I am registered as a legal consultant with the Government of Dubai, Legal Affairs Department since 2006 and further a registered practitioner with the Dubai International Financial Centre Courts ("DIFC Courts"). I have significant experience in the recognition and enforcement of foreign judgments and arbitration awards in both onshore UAE courts and DIFC Courts.

2. In the firm I represent, Fichte & Co, I am the supervising partner for the proceedings filed in Dubai by Applicant Tatiana Akhmedova ("Applicant" or "Ms. Akhmedova") against her former husband Farkhad Akhmedov ("Farkhad") and against his alter ego entity Straight Establishment in the Dubai Courts. I am also supervising the proceedings that have been initiated by Farkhad in the Dubai court of personal status wherein Farkhad seeks to establish a divorce and division of marital assets under Sharia law, notwithstanding the parties' divorce under English law which took place in 2016.

3.   I make this Declaration in support of the application of Ms. Akhmedova, to the U.S. District Court for the Middle District of Florida under 28 U.S.C. § 1782 (the "1782 Application") seeking discovery with respect to documents located in the United States and in this judicial district in the possession or control of an individual by the name of Humaid Abdulla Mohammed al Masaood al Muhairbi ("Al Masaood") for use in the following foreign proceedings:

(i)   the pending litigation in Dubai wherein Farkhad Akhmedov (Applicant's ex-husband) is seeking to determine his and Applicant's divorce anew according to Sharia law, the basis of which is Mr. Akhmedov's purported personal status as a UAE resident;

(ii)  the pending litigation in Dubai between Applicant and Farkhad Akhmedov and Straight Establishment, to recognize and enforce an English money judgment, which is currently under consideration of the Dubai Cassation (Appeal) Court.

4.   I am fully authorized to make this Declaration by Ms. Akhmedova.  I am fully familiar with the facts of the Dubai Proceedings listed above as well as the various foreign proceedings between Ms. Akhmedova and Farkhad in England and elsewhere.  Unless stated otherwise, the statements herein are based on my personal knowledge from my involvement in Ms. Akhmedova's case, as well as my review of relevant documents in connection with proceedings pending the United Kingdom as well as Dubai, United Arab Emirates.

### The Parties and Basic Facts

5.   Applicant has obtained two English money judgments rendered by the Family Division of the High Court of Justice in London (the "English Court") in favor of the Applicant. One against Farkhad Teimur Ogly Akhmedov ("Farkhad"), Cotor Investment, S.A. ("Cotor"), Qubo 1 Establishment ("Qubo 1"), Qubo 2 Establishment ("Qubo 2"), Straight Establishment

("Straight Establishment"), and Avenger Assets Corporation ("Avenger Assets"), jointly and severally, in the amount of GBP £125,569,492 plus interest and certain running adjustments (the "Initial Money Judgment"); and the second against Straight Establishment in the amount of $478,278,000 plus interest and certain running adjustments (the "Straight Money Judgment"). The English Judgments were awarded following an eight-day Financial Remedy Hearing conducted in the Family Division of the English High Court in connection with the divorce of Applicant Ms. Akhmedova and Farkhad Akhmedov.

6.      Applicant issued a divorce petition in London on October 24, 2013. Ms. Akhmedova was granted a *decree nisi*, stating that the English Court saw no reason why the couple could not divorce, on December 2, 2015. The *decree nisi* was made absolute on December 15, 2016. Thereafter, an eight-day financial remedy hearing was heard in the Family Division of the English High Court in November and December 2016. The purpose of the Financial Remedy Hearing was to establish the value of the couple's assets and to decide how to divide that value in a final distribution.

7.      However, on November 30, 2016 (the second day of the trial in England) a luxury yacht, the M/Y LUNA, beneficially owned by Farkhad via corporate shell (the "Vessel"), was transferred from its corporate owner, Avenger Assets, to another entity, Stern Management Corporation at the instruction of Farkhad and facilitated by his agents some of which are located in this District. One day later, on December 1, 2016, the Vessel was again transferred at the instruction of Farkhad from Stern Management Corporation to Qubo 2 with the assistance of Farkhad's agents located within this District. Later, Qubo 2 was found by the English Court to be the alter ego of Farkhad.

8. At the conclusion of the Financial Remedy Hearing on December 15, 2016, the English Court awarded Ms. Akhmedova a cash award of GBP £350,000,000 (approximately US $466.6 million) (the "Cash Award"). Farkhad was ordered by the English Court to pay the Cash Award by January 6, 2017. A true and correct copy of the Judgment and Financial Remedy Order are attached hereto as Exhibits 1 and 2, respectively.

9. On December 20, 2016 the English Court issued a freezing order (the "Freezing Order") preventing Farkhad and the other judgment debtors from dealing with his assets (whether in or outside England and Wales), and ordering him to make financial disclosure of his assets.

10. On December 20, 2016 the English Court also found that transfers of a 1) modern art collection and 2) the assets of Cotor,[1] to entities in Liechtenstein, including Qubo 1 and Qubo 2 "was simply the latest part of [Farkhad's] attempts to avoid his liabilities by purporting to transfer his assets to a new jurisdiction and thereby making enforcement more difficult." The English Court set aside these transfers on the basis that Qubo 1 and Qubo 2 "are no more than ciphers and the alter ego of [Farkhad]" and made the Qubo entities liable for the judgment debt together with Farkhad. Ex. 2 ¶¶ 11(g)-(h), 12.

11. Farkhad has not satisfied any portion of the Cash Award, including the Initial Money Judgment, and is currently in contempt of Court for breaching the terms of the Freezing Order. He has instead continued to engage in a pattern of deception aimed at concealing his assets and frustrating Ms. Akhmedova in her efforts to enforce her rights as a UK judgment creditor.

12. On March 8, 2017, in disregard of the English Judgment (under which Qubo 2 was liable on the judgment debt together with Farkhad), the English Freezing Order and a Freezing Order of the Liechtenstein Court (preventing Qubo 1 and Qubo 2 from removing, disposing of,

---

[1] In 2012, Farkhad sold his interest in ZAO Northgas, a Russian oil company, for US $1.375 billion. Following the sale, Farkhad transferred the sale proceeds to Cotor. Ex. 1 ¶ 77.

dealing with, charging or diminishing the value of, amongst other things a modern art collection and cash assets in the amount claimed), Qubo 2 transferred the Vessel to Straight Establishment. Straight Establishment is a Liechtenstein entity, which is operated from the same address as Qubo 2. Straight is the current registered owner of the LUNA and as of August 8, 2018 Straight and its agents have been permanently enjoined from further transferring ownership, control or possession of the LUNA by the High Court of the Marshall Islands.

13. On March 21, 2018, the English Court issued an order against Defendants Straight Establishment and Avenger Assets (the "March 21 Order"). The English Court found that Straight Establishment was an alter ego of Farkhad and served as his nominee. The English Court found that assets held and previously held in Straight Establishment's name, as well as assets held and previously held in Avenger Asset's name, beneficially belonged to Farkhad, including the Vessel which had been fraudulently transferred by Farkhad several times during the English proceedings.

14. Also on March 21, 2108, the English Court declared "with immediate effect that Applicant is the legal and beneficial owner of the Vessel," and ordered Farkhad and Straight Establishment to transfer title to Ms. Akhmedova within seven days. The English Court ordered that if the title transfer was not effected within seven days, Straight Establishment would be liable to Ms. Akhmedova for a liquidated cash sum of $487,278,000 (the "Straight Money Judgment," attached hereto as Exhibit 3). The English Court also extended the Freezing Order to apply to Straight Establishment and Avenger Assets, and specifically applied to prohibit the "removal, disposal, charging and/or diminution in value" of the Vessel.

I. The Dubai Judgment Enforcement Proceedings

15. Following the issuance of the English Judgments as well as the Freezing Order directed at Farkhad with respect to the Vessel, on February 7, 2018 Applicant filed an application

5

in the Dubai International Financial Centre ("DIFC") Courts against Farkhad and Straight Establishment (the owning entity of the Vessel), for recognition of the English Judgment. At the time of the DIFC application, the Vessel was in Port Rashid, Dubai, where it currently remains subject to a preliminary injunction issued out of the Republic of the Marshall Islands.

16. While Straight Establishment acknowledged the proceedings contesting the jurisdiction of the DIFC courts, Farkhad did not appear before the DIFC courts and instead commenced separate proceedings before the Dubai courts leading, on May 6, 2018, to an application to the Dubai Joint Judicial Committee to decide on the conflicting jurisdiction created by virtue of the separate proceedings commenced by Farkhad. On July 11, 2018, the Committee held that the case should be heard in the local Dubai courts notwithstanding that the proceedings before the DIFC court were by then at appeal stage.

17. The Dubai Court of First Instance issued a decision on November 12, 2018, in which it declined to recognize the English orders and judgments on the basis that the English Judgments did not appear to be final and conclusive based on the lack of a seal on the documents. On November 22, 2018, Mrs. Akhmedova filed an appeal against this decision.

18. On March 27, 2019, the Court of Appeal (Commercial Appeal No. 2646/2018) delivered a judgment, reversing the CFI judgment on the basis that sufficient proof that the English judgments are final and conclusive final has been given, and sending the file back to the execution judge at the Court of First Instance as the competent judge to hear the case (due to a recent change in the procedural rules).

19. Accordingly, on April 29, 2019, the chief justice of the Dubai Court issued his first "original" order to append the execution stamp on the judgment issued by the High Court of Justice

in London in the case. On July 17, 2019 a further interim order was issued directing the sealing of the English Judgment with the execution stamp.

20. Based on the above, Ms. Akhmedova registered the Execution No. 4128/2019 Commercial Execution on August 8, 2019 by a statement whereby she sought from the execution judge to "enforce the Judgment made in the Case No. FD13D05340 made by the High Court in London with the execution stamp, to deliver the possession of and transfer the title in the yacht Luna to Ms. Akhmedova for the satisfaction of $487,278,000 (or AED 1,790,746,650), and to order Farkhad and Straight Establishment to pay the courts costs and attorneys' fees."

21. The enforcement application remained before the execution judge at Dubai Courts and no decision was made. On October 31, 2019, Ms. Akhmedova applied to effect the executory attachment of the vessel Luna. On November 11, 2019, the execution judge granted her application to effect the executory attachment of the vessel Luna.

22. On July 30, 2019, Straight Establishment and Farkhad each filed appeals seeking to reverse the two orders dated April 29, 2019 and July 17, 2019 whereby it was ordered to seal the English Judgment made by the High Court in London with the execution stamp. The Dubai Court of Appeal decided to join the two appeals in order for one judgment to be entered.

23. On February 5, 2020, the Dubai Court of Appeal ruled to "grant the two Appeals as to their form. Second: As to the merits of the two Appeals, to overturn the order under appeal which was issued in the matter of the Order-on-Petition No. 14/2019 Execution Stamp, and to deliver a new judgment that is to dismiss the application made to seal the foreign judgment and the ancillary orders thereof – which were issued by the High Court of Justice in London under the number FD13D05340 – with execution stamp. The Court orders the First Respondent in the matter of the two Appeals to pay the costs of the two appeals and AED 2,000 of attorneys' fees."

24. The Court of Appeal rested its judgment which reversed enforcement and execution of the English Judgments on the reasoning that the sharing principle applicable in English Law (i.e., the division of marital assets ordered by the English Court) violates the Sharia Law and as a result contrary to the public orders and morals of the Dubai courts.

25. Ms. Akhmedova has appealed this ruling to the Dubai Court of Cassation. Her most recent filing was made on April 2, 2020. A true and correct copy of an English translation of Ms. Akhmedova's submission is attached hereto as Exhibit 4.

26. Both Farkhad and Straight Establishment provided submissions to the Dubai Court of Cassation in relation to Ms. Akhmedova's appeal, and following a brief oral hearing on July 20, 2020, a decision by the Dubai Court of Cassation is expected on August 13, 2020.

## II. Farkhad's Dubai Personal Status Claim

27. On or about February 23, 2020 Farkhad filed a new action before the court of personal status Dubai seeking a confirmation of divorce, in which he claimed that Ms. Akhmedova and himself had entered into a Sharia marriage contract at the time of their marriage in 1993. A true and correct copy of an English translation of Farkhad's claim submission is attached hereto as Exhibit 5.

28. Central to Farkhad's application to establish that the marriage was established under Sharia law and that a divorce and distribution of assets is proper under Sharia law is establishing his residence in Dubai.

29. Certain documents obtained during discovery in the English Proceedings from Farkhad's son Temur, who is closely involved with Farkhad's evasion of the English Judgments reveal a scheme to establish residency in Dubai.

30. Attached hereto as Exhibit 6 is a true and correct copy of an email dated November 6, 2014 (after the English divorce proceedings had been commenced) between Dubai counsel and Farkhad's English counsel which states their plan which they have called "Project Maldives" to avoid enforcement of Applicant's English divorce proceedings:

> "if the client were to establish residency (i.e. obtain a UAE residency visa) in the UAE and have an office or residential address here in the UAE prior to divorce proceedings being commenced in the UK, then in practice, based on consultations with local litigators and other research the Dubai courts are likely to not enforce a UK matrimonial judgement in the UAE and the claimant would then need to re-apply for divorce proceedings in the UAE which would be subject to the Personal Status Law (Federal Law No. 28 of 2005) and the Civil Code of the UAE. There is no bilateral treaty between the UK and UAE for matrimonial judgements as the jurisprudence varies significantly (e.g. spousal support is an alien concept here in the UAE but prevalent in the UK)…. The residency rules in the UAE are relatively flexible and the client does not have to remain in the UAE to be a resident. Instead, the client needs to be in the UAE once every six months in order to fulfil the residency requirements."

Ex. 6 at 11-12.

31. Thereafter, Dubai counsel recommends the following in order to proceed with obtaining a residency visa in order to avoid enforcement of the English divorce in the UAE:

> The second option, and this rests on the creative side of things, is that we have the client's residency visa processed under one of Don's very trusted clients who would be willing to extend a favour to the client. We're checking on a no-names basis to see if this is possible. If it is, and subject to your approval, this could be the fastest way to lock the client into the UAE civil system by virtue of his residency. This buys us time to incorporate the entities after which, we can migrate his visa to the formed entities.

Ex. 6 at 9.

32. Finally, Dubai counsel confirms, "I have just received word from Don that option 2 is on the table and one of Don's anchor clients would be willing to help with Project Maldives gratis." *Id.* at 7.

9

33. Attached hereto as Exhibit 7 is a true and correct copy of an email dated June 9, 2015 wherein the same English counsel in correspondence with Farkhad's son states, "Since October last year we have been trying to put in place a structure in the UAE, where it would be very difficult for your Mother to enforce an English judgment", and further, "your Father would need to obtain a UAE resident's visa to open an account" at Emirates National Bank of Dubai (Emirates NBD).

34. Attached hereto as Exhibit 8 is a true and correct copy of an email dated June 10, 2015 from counsel to Temur which describes the priority prior to a June 22 divorce hearing in England as to "secure everything as quickly as possible" and buy sufficient time for Farkhad to "get the appropriate protections in place."  Further to this, that "Qatar/the UAE still seems like a good option in principle, but so far this has not worked out in practice… in the longer term your Father can look at switching to another bank, possible Emirates NBD."

35. Attached hereto as Exhibit 9 is a true and correct copy of an email dated June 23, 2015 from counsel to Temur stating, "for as long as your mother continues with the English divorce proceedings, the very best way for your Father to protect his money and assets would be to move them to (and keep them in) a "safe" jurisdiction, meaning a country where your Mother could not enforce an English court order – for example Azerbaijan, Dubai, Qatar etc".

36. Attached hereto as Exhibit 10 is a true and correct copy of an email dated July 14, 2015 from counsel to Temur discussing the strategy to place assets in various jurisdictions including the UAE, where it would be difficult or impossible for Ms. Akhmedova to enforce any English court order: "All the banks that we have been looking at appear to be good options in theory because they are located in UAE and Qatar where English judgments are not enforced as of right.  Reed Smith advise that if your Father holds a residence visa for the UAE and is a Moslem

any attempts to enforce an English financial order on divorce would be dealt with in accordance with local law, which would not be favourable to your Mother."

37. Critical to the plan described above was obtaining a residence visa for Farkhad through Dubai counsel's associates, as described in the earliest email. Based on the Residence Visa that Farkhad ultimately submitted to the Dubai Court, it appears that the visa was obtained in July 2015. Attached hereto as Exhibit 11 is a true and correct copy of the visa submitted by Farkhad.

38. As reflected in Exhibit 11, the visa-issuing company was Humasen Energy DMCC. This company (No. 1403167) was registered on 23 January 2014 in the Dubai Multi Commodities Centre Free Zone. The sole director and shareholder of Humasen Energy DMCC is Humaid Abdulla Mohamed Al Masaood Al Muhairbi ("Al Masaood").

39. Attached hereto as Exhibit 12 is a true and correct copy of an email dated January 25, 2016 with Dubai counsel which discusses the requirement that Farkhad return to the UAE at least every six months in order to keep his resident visa current. The email states:

> If the visa is automatically cancelled for the 6-month reason stated above, it cannot be renewed and Humaid's company must go through the process of removing the visa from its records. If desired, a new visa can be applied for but that is a new process, but that is complicated and will take additional effort… The failure of FTA to keep his visa current will create a problem for Humaid's company's annual renewal, which is in process. So, this must be resolved ASAP for Humaid's purposes as well as FTA's visa purposes… Humaid will incur an additional insurance expense upon his renewal if FTA's visa is to remain in place.

Ex. 12 at 5.

40. On January 27, 2016, counsel advised that "this week, Humaid will have to report FTA as "absconded" in order to renew his visa-sponsoring company's corporate renewal (because FTA won't cooperate to maintain the visa)" and on January 31, 2016 stated "Unfortunately, FTA's rude disregard for the visa situation and all we have done for him has now created significant

11

problems for Humaid al Masaood's company and his renewal process" and further "[u]nless FTA is going to cooperate and reverse his position on all this, Humaid needs to register FTA as absconded first thing Monday…" Ex. 12 at 3.

41. Farkhad's resident visa was due to expire in 2018. *See* Ex. 11. However, I understand that Humasen Energy DMCC's operating license was cancelled and the company has been struck from the register. Accordingly, Farkhad's visa was prematurely cancelled in July 2016.

42. It is clear from the foregoing that Al Masaood was individually involved in obtaining the UAE residence visa for Farkhad which substantially aided and abetted Farkhad's efforts to hide assets in the UAE during the English divorce proceedings. Further, this residence is being used to further Farkhad's recently-filed application to re-establish the couple's divorce in the Dubai courts under Sharia law.

43. Finally, information received through discovery requested in other actions reflects that Al Masaood received funds in late 2018 and into 2019 from an entity called Y.Co NY Inc., a company affiliated with the yacht managers of Farkhad's superyacht located in Dubai, the M/Y LUNA. It is believed these payments may be related to recent actions taken by Farkhad in connection with his UAE residency.

44. It is believed that Al Masaood resides at 51 Martinique Avenue, Tampa, Florida 33606. Local property records reflect ownership of the residence in his wife's name, Salena M. Masaood (a true and correct copy of which is attached hereto as Exhibit 13).

**Applicant's Request for Discovery Pursuant to 28 USC § 1782**

45.  Under the circumstances, the following categories of evidence will be relevant, important and useful to Ms. Akhmedova's adjudication of the Dubai actions as set forth above, all of which evidence is located in the United States in the possession and control of Al Masaood:

    a.  All documents in the possession or control of Al Masaood concerning efforts made by himself personally or using Humasen Energy to obtain a United Arab Emirates (UAE) residency visa for Farkhad Akhmedov from 2014 to present, including but not limited to:

        (i)  any communications between Al Masaood, Humasen Energy or their representatives and Farkhad Akhmedov or his agents or representatives, or any third parties;

        (ii)  any communications between Al Masaood, Humasen Energy or their representatives and the UAE General Directorate of Residency and Foreigners Affairs or the Federal Authority for Identity and Citizenship regarding Farkhad Akhmedov;

    b.  All documents and communications related to "Project Maldives";

    c.  All documents in the possession or control of Al Masaood concerning funds received from Y.Co NY Inc., the yacht manager for Farkhad Akhmedov's yacht the M/Y LUNA, including but not limited to those received in 2018.

46.  Applicant also requests that she be permitted to serve a subpoena for taking the deposition of Al Masaood within this District and in accordance with the Federal Rules of Civil Procedure, at a time mutually agreed by Applicant, Al Masaood, and their respective counsel.

47. Upon information and belief, Al Masaood has control and access to all of the above information as he appears to have assisted Farkhad in his individual capacity, despite listing Humasen Energy DMCC as the sponsoring entity for Farkhad's visa.

48. None of the information requested has been made available to Applicant and is not available to Applicant within Dubai, as Humasen Energy DMCC has been struck from the register in Dubai and cannot be served there. The company's principal and sole shareholder resides in this District.  Nor would granting the assistance requested by Ms. Akhmedova offend any foreign jurisdiction or constitute a circumvention of foreign proof-gathering rules.  There is no UAE/Dubai rule of evidence that would prevent discovery obtained under 28 U.S.C. § 1782 being used in the Dubai proceedings.

49. Under the circumstances, evidence that will be relevant to Ms. Akhmedova's entitlement to relief in the Dubai Actions is not available in Dubai but is located in the United States in this District.

50. As such, Applicant respectfully requests the Court grant her request for discovery pursuant to 28 U.S.C. § 1782.

** Remainder of Page Left Intentionally Blank**

I declare under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief

Dated:   Dubai, United Arab Emirates
         August 10, 2020

_____
Alessandro Tricoli